The United States Court of Appeals for the Federal Circuit is not open and in session. God save the United States and the Commonwealth. Good morning ladies and gentlemen. Please be seated. We have four cases on the calendar this morning. A case from the Court of Federal Claims involving the taking. Two patent cases, one from the patent office and one from the district court. And a government employee case that is being submitted on the briefs and will not be argued. Before that, however, I understand we have a motion. I don't know if it will be a contested motion. In any event, we do have a motion and I will ask Judge Chen to make a motion. Thank you, Judge Lurie. Good morning. I do have a very important motion today. I move the admission of Jacob Ewart, who is a member of the bar in good standing with the highest courts of Virginia and the District of Columbia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. I know these things, Judge Lurie, because Mr. Ewart has been my clerk for the past 20 months. And in that time, he has been an important stabilizing influence on a sometimes chaotic chambers. And I have always appreciated that. I have gotten to know him and he came in already as a fantastic lawyer. And I think he is leaving 20 months later as an even greater one. But much of that is due to his own abilities and character and intellect. I've enjoyed my time with him in terms of sharing ideas about cases in the law. And I've also gotten to know his wife, Trish, and daughter, Vanessa. And I look forward to seeing them go forward in life. And I know that they'll always be part of my chamber's family. And for all these reasons, I urge that my motion be granted. Thank you, Judge Chen. Occupying the adjacent chambers, I have to say, I haven't heard of any disorder. So perhaps your comments are most accurate. Consult with my panel. I'm going to concur in the result because I feel the need to speak separately. I feel the need to speak separately because it's very unusual for this to happen. But on multiple occasions, given that I couldn't handle my own workload, I had to reach out to Judge Chen for support. And he lent me Jake. Jake actually helped me with Akamai. After 20 versions of Akamai, I got to the point where I could no longer even read the words on the page. And I needed someone objective to come in and read it. And Jake came in and helped me tremendously. I think I had told Judge Chen it would take two hours, and it took like two weeks. But he was a great resource. And then he actually drafted a recent presidential decision for me because I just needed some extra help. So that is very unusual for us to share clerks. Judge Chen was very generous with Jake. It was all very unusual to share. My great fortune to have gotten the opportunity to work with him as well. I certainly don't know him as well as Judge Chen does, but I am happy to echo his support. And I therefore agree to grant the motion. I think we have a unanimous panel, so the motion is granted. Mr. Hewitt, would you stand up and take the oath? Let us now proceed to the official business at hand. The first case is Carriage House West, et al. versus the United States, 2013, 51-32, et cetera. Mr. Kelly. Good morning, Your Honors. May it please the Court. And again, on behalf of everyone in the courtroom, I would like to extend our congratulations to Mr. Hewitt. Your Honors, we are here today to deal with a specific issue, whether the appellant's takings claims rising under the Emergency Low-Income Housing Preservation Act and the Low-Income Housing Preservation and Resident Home Ownership Acts were timely asserted under the Six-Year Statute of Limitations, 28 U.S.C. Section 2501, when the original complaint was filed in August 25, 1997. We believe the Court of Federal Claim erred by dismissing the appellant's claims as untimely after concluding that all claims under the preservation statutes accrued on the first date that the specific owners could have prepaid their mortgages if the preservation statutes had not been enacted, which was more than six years before they filed their complaints. Your Honors, we believe that the Court of Federal Claims here was mistaken because it disregarded binding precedent in this circuit in the Kruppel v. United States decision and also disregarded the United States Supreme Court decision in Franconia Associates v. United States, both of which should have led the Court of Federal Claims to reject the prepayment eligibility date as the bright line for accrual of the statute of limitations here. And not only did the lower court reject the binding and persuasive authority of the circuit. The lower court said Kruppel was dictum, so why isn't it? Because under either interpretation, the claim was untimely. Well, Your Honor, what I would say is several, well, let me say several things. First of all, you cannot tell when the metro train is late unless you know when the metro train was supposed to arrive in the first place. And it's clear in reviewing, as I reviewed Kruppel, that that was what the court was trying to figure out. Were these claims timely? And so the decision with respect to when the statute of limitations began to accrue in Kruppel is clearly essential to the decision. It's not a matter that's discussed for purposes of illustration or analogy. You couldn't have decided if the claims were untimely unless you decided first when they were due. And I think that although we would argue that the matter was decisive and clearly part of a holding, I think the proof is in the fact that many of the cases subsequent to Kruppel have looked at that decision as establishing when the limitations period begins to arise for a temporary taking claim such as this one. If it is dictum, it's very persuasive dictum, and it's very on point. And other courts that have looked at this matter, and specifically in connection with the temporary takings under these preservation statutes, have followed it. What would be the best case that you have that has held, not just said something in dicta, that a taking claim accrues at a different time than a taking claim ripens? Is there such a case? I don't know if there's a specific case that's looked at both of those issues. I know that there are a number of cases which have looked at the issue of ripeness and have concluded that the date upon which a claim ripens is not necessarily the same as the date upon which the statute of limitations begins to run. If you look at cases like the, we cited in cases like the Addington case from the Ninth Circuit, and my Spanish is not very good, but I believe it's the Association case. The First Circuit case. Both of these cases dealt with an issue about ripeness versus the limitations of acquisition. And what the Addington case specifically said was that what we're talking about when we talk about accrual for limitations purposes, and remember, not all takings are created equal. There are physical takings, there are permanent takings, there are regulatory takings, and then there are temporary regulatory takings. And I think what the Addington case adds to the analysis is by saying that when you look at when a claim arises for statute of limitations purposes, when it accrues for statute of limitations purposes, what's critical is the information that's available to the person who's suffering the taking. What Addington said is the injury at that point has unquestionably culminated, and the issue is whether the plaintiff's learned or should have learned of the injury so long ago that it would no longer be fair to bring the suit. And that's consistent with what this court said in Preble, because in Preble, analyzing the issue of when the statute of limitations arises, the court there said, property owners cannot sue for temporary taking until the regulatory process that began it has ended. This is because they would not know the extent of their damages until the government completes the temporary taking. So what Preble adds to the... But one of the problems I have with that argument is LIFRA wasn't enacted as a temporary taking. A LIFRA was, but not LIFRA, the second one. It was enacted until HOPE was passed in 1996. It wasn't a temporary taking. Not everything is a temporary taking. A LIFRA clearly was. By its own terms, at enactment, it was a temporary measure. But LIFRA was not a temporary taking. You had no reason to think Congress would ever change LIFRA. It was enacted as a permanent taking. And only upon HOPE's enactment in 1996 did it actually convert it into a temporary taking by Congress' choice to cease to apply the law of LIFRA. So in a scenario like that, where you could go hundreds of years from a statute's enactment that deprived you of a right, and then a hundred years later that statutory deprivation is lifted by another statute, you think that's a temporary taking and the rule for statute of limitations should be that you have six years after the end of the hundred, even though for a hundred years you thought it was a permanent taking, not a temporary one? Well, what I would say is the issue of what might have been a permanent taking is interesting. But obviously different rules apply to a permanent taking than apply to a temporary taking. And this was a temporary taking. By the time the plaintiffs filed their lawsuit in 1997, the HOPE Act had been enacted. But that doesn't make any sense because it doesn't deal with the logic of my question. My question was, if Congress enacted LIFRA and then a hundred years later withdrew it in HOPE, you're telling me that because they withdrew it in HOPE one hundred years later that there's no statute of limitations bar because it converted a permanent taking into a temporary taking? I would assume, Your Honor, that if the plaintiffs had a claim and had the degree of information that they needed, they would take action on an otherwise permanent taking based upon the information that they acquired. Yes, but your rule of law that any later withdrawal by Congress converts a permanent taking into a temporary taking and that therefore the statute, because if this was a permanent taking, we would all agree, accrual would turn from the date of new or reasonably should have known, right? And so your point is that a much later in time withdrawal of a permanent taking to convert it into a temporary taking holds the statute of limitations what could be centuries. Well, I would say since that's a hypothetical situation and clearly something like that could have happened and hasn't happened yet, I would imagine that if the rulers, when they knew or should have known, so far as the plaintiffs in a permanent taking situation would face the realities of what the standard is for permanent taking. But once again, the facts of this case and CREPL has been interpreted by subsequent cases as dealing with a situation where there was a close to the taking period. And under this circumstance, this happened approximately 18 months before the lawsuit was filed, a little bit less. The reality is that the courts have said, let's look at the end of that taking period to determine whether they knew or should have known because that's the critical time period for such a taking. I don't think that a hundred year long period would be, I think, too long for a plaintiff just to say, I didn't know something had happened to me. But I think that where we have a fairly narrow period of time from 1990 until 1996 when the statute was abolished, Congress took this statute offline and terminated the prepayment prohibitions with some limited exceptions. For a reason, and I think part of the reason was because lawsuits like these were being filed. But Congress recognized that it no longer wanted to continue what was done. And under those circumstances, there's no reason to go back and reconsider what is, in fact, a robust body of case law that has come out from this court. The Senevier Gardens case, the Federal Circuit case from 2005, reached the conclusion that even in that instance, Judge Moore, some of the claims were continuing, the takings were continuing as of that point. And they applied PREPEL because they understood that this should be deemed to be a temporary taking. The court in Reed Island applied the same rule, looked at PREPEL. So you have a very robust body of case law that's been built up over more than 20 years, starting with PREPEL and then continuing through many other decisions by this court, and which uniformly line up on one side. And that side is that with a temporary taking such as this one, the limitations period should begin to run at the end of the regulatory action. And look at what's on the other side of the case. What is on the other side? What other decisions are out there? Well, there's the Court of Federal Claims decision below. There isn't any Supreme Court case that deals with temporary takings and announces a rule like PREPEL. I believe that's correct. I haven't seen the Supreme Court reach a specific decision. But the Supreme Court has in Brubaker addressed as applied takings, discretionary takings, which is what this is, versus non-discretionary takings. And in Brubaker it said for non-discretionary takings, the date for ripeness and accrual is the date of the enactment, the facial date. But that's clearly not what applies here because this is a discretionary takings. So what should the date be for a discretionary takings under Brubaker? Well, I think that on the one hand, Brubaker did recognize the distinction between takings, claims that are facial challenges and as applied takings. But this was a facial challenge in that case, and the Court really didn't have an opportunity to determine whether a claim would accrue under the statute of limitations for this sort of a claim, I would say, Your Honor. The Court only determined in that case the claims were not right because the regulation, in fact, in that case, never went into effect. So I think it's factually distinguishable in terms of the situation. This would be perhaps a situation as to if HUD had never actually put into operation the prepayment prohibitions. But I believe, as I understand what happened in Brubaker, it's factually distinguishable because the alleged regulation that had been challenged never actually took effect there. Mr. Kelly, you want to save some time for a rebuttal when you're into that period? Yes, I would, Your Honor. I didn't see the light was on. I appreciate the Court's time today. Thank you, Your Honor. May it please the Court. The Court should hold that the language in Kreppel relied on by the plaintiffs is dicta and non-binding, and the approach suggested by Kreppel is unworkable, which is why it was rejected by subsequent court decisions. And I'd like to start off with Judge Moore's 100-year problem, which actually in my notes was a 40-year problem, but I think 100-year makes it even more distinct in that the rule advocated by the plaintiff says that every time a statute is changed, it could trigger a temporary taking that was 100 years in the making, which is the exact opposite of what the statute of limitations is trying to do, which says gather your information and go forward with your case as quickly as possible. And if you look at it, it creates a problem both for the property owners, it creates a trap for the government, and it creates a burden on the Court. So if a statute is changed, whether it's temporary or permanent, they should bring the action right at that point. And they should bring permanent action, as Judge Moore suggested. They should make it a permanent taking claim, and if somehow the permanent taking was truncated, then they can amend and add a temporary taking claim. If the case goes through and the statute hasn't been changed or amended, it goes through as a permanent taking, and that's how it's evaluated. One of the difficulties I have, despite the logic of what you're explaining, is CREPL. I can't undo precedent of our Court. I understand your claim that it's DICTA. However, the language of what you call DICTA sounds a lot like a holding to me. Thus, property owners cannot sue for a temporary taking until the regulatory process that began it has ended. I don't know. If we have issued this sort of command, and it has, in fact, been followed by Court of Federal Claims cases, not necessarily our own cases, but Court of Federal Claims cases. And it has not really been significantly called into question by our own cases. What does that mean for a property owner who supposedly waited in reliance because of this? Because this language, property owners cannot sue for a temporary taking until the regulatory process that began it has ended. What if it truly is a temporary taking like ELIFRA versus LIFRA? When ELIFRA was enacted, it was expressed that it was temporary in nature. In that case, if a person waited until the end of the regulatory taking, and CREPL was the standard, the law at issue, would it really be fair to fault them in light of this language in CREPL? Your Honor, there's a number of things there, so I'm going to try to hit them all. I'll start with the dicta question that you began with. What the CREPL court started with, they identified what the question was. The question here is whether all events occurred to fix the alleged liability of the government six years before the claimant's 1991 takings claim. That's at page 631. So that's the question. And it turned out, because the taking began in 76 and ended in 84, every fact, every part of the temporary taking was more than six years before the time. So the answer to that question is yes, they were all fixed. It didn't matter. It was irrelevant whether the court started counting at the beginning or the ending. And in fact, if the court had reached the completely different, the reverse decision, it wouldn't have affected the outcome. That's how we know it's dicta. What this court has said about dicta is a dicta is, quote, a statement that is unnecessary to the decision in the case and therefore not precedential. I agree, Judge Moore, that they used the language of a holding, but it was in the nature of dicta. And this court has explained, again, this is in the Coe-Steele case, because statements made in dicta do not implicate the substantive holding of the case, they cannot be considered binding authority. Well, there's several different kinds of dicta, right? There's dicta moreover. Whenever the court says moreover, pretty much everything that comes afterwards is a good candidate for being alleged to be dicta, right? Fair enough, Your Honor. And that's a clear case. Those are easy cases. The court said, we also would have held. These are easy cases for dicta. This is a harder case because the language of the holding clearly establishes what it thinks it's making is a rule about claim accrual. Your argument is it didn't need to go that far, because under either rule, this particular case would have come out the same way. I'm not positive that converts this holding into dicta is what I'm struggling with. I would say respectfully, Your Honor, it is not for the court itself who is issuing a decision to determine whether it's dicta. It's for the subsequent court that comes along and views it in the scope of what they're doing. And so what this court has done in a series of opinions, in the Bass decision, in the Caldwell decision, and ultimately in the Navajo Nation decision, this court has considered this issue and has not relied on Kreppel. So in Bass, the court considered whether they have to wait for the end of the taking period, which is what Kreppel says. And what Bass said is, whoa, whoa, no, you don't have to wait for the end of the taking period. What this court said in Navajo Nation, where it was teed up 100%, where the plaintiffs were... But us saying you don't have to wait until the end is not the same thing as saying you have to bring it earlier, which is what you're saying. Because look at all these awful nuclear waste cases that I have to deal with because they keep getting brought every six years because the statute of limitations requires you to bring your damages every six years in series. And so we're going to be getting these things until 2048, is my understanding. Until the nuclear waste is no longer nuclear, Your Honor. Well, then I don't even know what it is. But you see the point is that obviously in a case like Bass, it's possible if the temporary taking is going to be of a long duration, you want to allow them to seek compensation at an interim point and then seek it again six years later or whatever else. So I don't see Bass as dissing Kreppel. No, it was a step back. But Navajo Nation, where Kreppel was teed up, it was argued by the plaintiff, it was rejected by the court, and in rejecting it, the plaintiffs lost... Tell me the best language, and I have Navajo here. Where's the best language where you think it rejected Kreppel? The court cited Kreppel? I'm sorry, what? Yes, it did, Your Honor. So the alleged taking in Navajo Nation began in 1966. It was unarguably a regulatory taking, and at the latest it began in 1980, and it ended in 1984. And what this court said was, and the plaintiffs argued a series of ways that their claim was timely. And what this court explained was, was that our precedent requires that temporary reversible takings must be analyzed in the same constitutional framework applied to permanent irreversible takings. And then the court went on to say, this court has previously rejected the notion that the cessation of a taking claim, and it rejected the plaintiff's claim. They were kept out of court based on if Kreppel had applied, if they had done what the plaintiffs were asking, those plaintiffs would have not been pushed out of court. Kreppel was cited, basically in a C also, for basically a different proposition, for the idea that a case must be right before you can bring it. But there's no way that Navajo Nation can be read as it is not dicta, as written, without taking Kreppel to mean that... Do you think Navajo Nation implicitly declared the clear holding in Kreppel dicta? I think it would have to, and in answer to your Honor's question, if the plaintiffs in Navajo Nation had relied on Kreppel, the court basically says, you have to bring your case as early as you can bring your case. And that takes me back... If it's not, if you are correct, and if it is not, we're not bound by Kreppel, don't you agree under Brubaker, the time vis-a-vis a discretionary holding, a discretionary takings accrues, or turns right, is not the date of enactment of the statute, for example, which would be the day LIFRA was enacted. It's the day that the agency took action that actually deprived your property of rights. Plaintiffs are allowed to bring a facial takings claim if they wish. These are as-applied takings claims, so nobody's arguing here, at least not anymore, that the date that the statutes were enacted is the date. The question about when it's applied to these plaintiffs, these plaintiffs have themselves pled that it was applied to them at the time that they could have offered the money and first prepaid. In their complaint, they said that the taking began on that date. So it could be argued that they, and we have in other instances, argued that they should have gone through the application process and sought permission to prepay, and if that was rejected, and so that then these claims wouldn't even be right because they never sought that. But these claims are not challenging the rightness, Your Honor. There is an argument that we made in an earlier iteration that was not so successful in the Anaheim case that, so we have not, we're not raising that claim. We are agreeing with the plaintiffs. These claims ripened on the date that they could initially prepay. Because it would have been futile for them to apply for the exception to the rule. That's what they've argued. And so based on that... I mean, that's the basis for why you're conceding it. Yes, Your Honor. We are not challenging the fact. They have asserted that it would have been futile. We are not challenging that fact on this appeal. And so that is why the date starts from there. And just to be clear, because on page 11 of your brief, which you don't need to pull out right now, but on page 11 of your brief, you indicate that because they argue it's futile, this claim had to have been brought on the day they could prepay. You're arguing that under the facts of this case. And I just want to make sure that I'm right about that and that you're not stating that the Krepel rule should be replaced with a rule that statute of limitations begins on the day you could have prepaid necessarily. Because that would contradict Brubaker for an as-applied notion. It should be the date that the statute applied to you. I'll give you an example. Say somebody six months before they could prepay, they went and tried to prepay maybe early and they were told, look, you'll never prepay. That could have started earlier. If they had gone through the process, taken them two years to go through the process, and then they got a final no, then that could have been the date. But based on their allegation, which we are not challenging, that it would have been futile under these circumstances, their first opportunity to prepay is the date when it runs. But the one other caveat I want to bring up, just to make sure that we're on the same page, is when it comes to futility, right, maybe suppose it wasn't futile on the day they could have prepaid. Suppose that the agency began by granting lots of all future prepayments at some point in time, such that the futility idea really didn't kick in on the day they could have prepaid, but kicked in a few years later. It's an interesting, I would suggest, Your Honor, that if at the beginning it did not appear futile, the proper thing for them to do when their date comes up, if it did not appear futile, the proper thing would have been for them to go ahead and go through the process. And if at some point it's like, forget it, nobody's getting through and it's understood that it's futile, then that would trigger it, even if they didn't have a final decision. That could trigger it. But of course, there's no contention here. Here it is understood. Everybody says the futility date is the day these things became available. For this case, yes, it is, Your Honor. I'm seeking to avoid bright-line rules in an as-applied universe, because in an as-applied universe under Brubaker, it seems to me the date could be different for every person. It could be, especially if everybody in an as-applied universe, let's say it's not futile. Everybody goes through this process and everybody gets a no at different times or a yes and then they're off, and a no at different times, then it would start when they got the no. Yes, an as-applied universe can provide two different neighbors with different results. Here, in fact, one of the problems with the way the plaintiffs argue cripple is you've got two neighbors that could have tremendously different results, because one of them could look at a statute and say, I'm going to sue now under permanent taking claim. The other one could say, some days Congress might change this. I'm going to wait. The first one could be litigated, resolved as a permanent taking. The other one, maybe they guessed wrong. It was never a temporary taking, so they lost their claim entirely. Maybe they guessed right, but it was 50 years, and it's a completely different analysis based on the 50-year looking back. What the plaintiffs are arguing is it could have a different result for different neighbors. It also is unfair for the government in that every time the government passes any regulation or statute, it has to face the possibility that even one that gives property back to plaintiffs could face a takings claim. What would have happened here if in 1991 all of these parties actually filed their takings claims, because they ripened at that point, and then it was litigated as a permanent taking, and damages was calculated as permanent takings, and that was all wrapped up before the HOPE Act passed? They would keep the money. The government wouldn't try to claw some of that back because now what had been always understood as a permanent taking was actually just a temporary taking? If it had gone to final judgment, Your Honor, it's final. In fact, I think that the plaintiff's theory invites the reverse. If at the end of the temporary taking, if everything is still in play, and maybe we've given out money on a permanent taking theory, but if everything is reopened at the end of the temporary taking theory, it would seem fair that if we're going to be paying out money, we should also be able to pull back money that we paid on a permanent taking. That's not the way it should be. It should be you bring your claim, if the government doesn't change the statute or whatever before your claim is finished, then that is the way you get compensated. I have one last question, if you don't mind. Regulatory takings are much more difficult, obviously, to contend with than physical takings for everyone, because of the test that includes the nature and extent of the interference with the right, the reasonable investment expectations. In Penn Central, the Supreme Court expressly recognized in footnote 36, and the government conceded in that case an oral argument that if an appellant can demonstrate changed circumstances, that could matter. Suppose in the beginning, when you first enacted prepayment, that this was not even a viable candidate for flipping to condos or charging higher rents or something like that, such that they didn't have an interest in prepaying, that there wasn't a taking at that point. But it really became a taking later, because the economy changed in a way that really suddenly resulted in a pretty significant diminution of value for them, a diminution that wasn't present on the day of LIFRA, but became present as applied in application over time. Changing circumstances would always open the door, wouldn't it, to reconsideration? Respectfully, Your Honor, if the things that change are the statute of regulation, yes. If the facts on the ground change, then they need to bring their claim within the six years. So with respect to the example that you gave, at the time that they were denied the right to prepay, presumably at that point, from the perspective of that point, it's a permanent taking. And they're viewing it, we'll never be able to prepay. And they would have to look at, okay, what's the expected burden at that time of losing the right to prepay? And maybe they decide, it's not such a big burden, so we're not going to bring it. And it is. Under Penn Central, it is a balancing test. And maybe at that point, it doesn't look like much of an imposition. But what they should be doing at that time is projecting. And there are experts who I have seen project, well, in five years it might get better and then better and better. And sometimes it's bound by the imagination of the expert. But they could say, there is a possibility it will do this. And that's what an expert is employed at to do at that time is, what is the potential range of possible economic impact? But yes, they need to do it from the time that the regulation is put in place. And in fact, Your Honor, separate from statute of limitations, they would need to do that anyways. Because that is the time of the legislation. Thank you, Your Honor. Thank you for the extra time. I appreciate it. Mr. Kelly has some response time. Take five minutes if you need it. Well, thank you, Your Honor. Hopefully I'll be able to be as brief and on point as possible. With respect to the question that was posed during the opening segment, with respect to the difference between permanent and temporary takings, my colleague, Mr. Whitaker, pointed out that in our reply brief on page 21, we cite to the Seneca Gardens 10 decision, the final decision of this court in the Seneca Gardens case, where the court stated there that according to the Penn Central test, it's the same whether the regulation is permanent or temporary in nature. Although in the latter situation, that is a temporary taking, the court must carefully consider the duration of the restriction under the economic impact prong. So there is a distinction that this court has drawn between the two, and duration does become a particular question with respect to a temporary taking that wouldn't apply in a permanent taking situation. The Governance Council indicated the statute of limitation should force people to go forward with cases as soon as possible, and I think that's really, in essence, the beauty of the Kreppel decision, and it's consistent with the Supreme Court's decision in Franconia, where they talk about the practical considerations of how you apply the statute of limitations. Because what Kreppel does is extend the jurisprudence of Penn Central and its progeny with respect to those factors, the nature of the taking that's involved, the economic impact, and the interference with the owner's expectations. Kreppel takes that and says, well, what is fair to say to a person who is the potential victim of a taking, with respect to when you have to come to court and do something about it. And Franconia clearly says you don't want them to have to come to court as soon as that taking might occur. It seems like that's what the older terrorist was thinking about, and perhaps this court's decision in Franconia were looking for bright lines as well. But what Franconia tells us and what Kreppel tells us is that that's not right. Under the Penn Central test, it may be that the degree of interference with an owner's rights is not so extreme at the beginning of the regulatory taking period to put them in a position where they knew or should have known that it was time to bring a lawsuit. And you certainly don't want to force thousands, in this instance tens of thousands of owners around the country, to go to the Court of Federal Claims and file taking claims as soon as the door opened, as soon as the impact occurred. It's far better to wait to see whether that impact was profound enough for them to decide that they had a legitimate claim. The appellants here did. They felt that the imposition of the prepayment statutes was sufficient to require them to bring their action. But that was something that they were able to make a decision about to discern later, not at the opening. And the court does not want, in fact, and Franconia tells us that we should not, encourage people to rush to the court for the hope of preserving their claims for fear that if they don't, they'll lose them. There was a discussion in the Bass case, and I think that really all the Bass case does is make it clear that you don't have to wait until the end of the regulatory taking period to bring a claim. But that does not mean that you should be required to come at the beginning of the taking period to file a claim. I think that's a fairly limited holding. I don't think that Navajo Nation overrules CREPL. It would be a very strange decision, indeed, for a case that cites to the very proposition we're citing to here, to somehow read that as overruling a decision that it's citing to. All Navajo Nation said was, again, that you don't have to wait until the end of the taking period to bring a claim. And I think that the other portion of this analysis that needs to be added, the other guidance that Franconia gives to us, is that just as the court concluded there that the mere enactment of a LIPA didn't trigger the limitations period for those claims, the mere beginning of the regulatory period should not be deemed to trigger the limitations for the regulatory period. And Franconia recognized that this was not a right. The prepayment language in the mortgage notes was not a right that had to be invoked on a specific day. You could prepay on that prepayment eligibility date or any date thereafter. And, again, consistent with the way in which those statutes were written and what Franconia said about them, Franconia recognized that this was a string of payment opportunities. And to say that the limitations period begins to block the entire claim, because it's measured from the beginning of the limitations, excuse me, from the beginning of the regulatory action, mistakes what the court in Franconia said. So I'd conclude simply by reminding the court that, in fact, there is a robust and cogent and complete and concise and consistent line of cases from this court that stretch back to the Prepl decision and that the court, we hope, will simply decide that that is the right rule and that there really is no better rule, there's no alternative, the court should not leap into a legal void and overturn what is, in fact, the solid rule in this circuit.